# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

| | | |
|---|---|---|
| **DEBRA T. MULLIS,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **5:03CV352(DF)** |
| | : | |
| | : | |
| **BROWN & WILLIAMSON TOBACCO** | : | |
| **CORP.,** | : | |
| | : | |
| **Defendant.** | : | |

## O R D E R

Defendant Brown & Williamson Tobacco Corp. ("B&W") has moved for Summary Judgment (tab 18) against Plaintiff Debra T. Mullis, an employee of B&W who filed this lawsuit seeking damages and injunctive relief for hostile-environment sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964.  Plaintiff alleges that she was subjected to actionable discrimination when fellow co-workers looked at magazines in B&W break rooms containing pictures of provocatively dressed females.  On several occasions, Plaintiff experienced objectionable behavior ranging from the use of profane language to the glaring looks of her co-workers.  To support her retaliation claim, Plaintiff alleges that B&W subjected her to an adverse employment action when it failed to discipline its employees for several instances of conduct she claims occurred as a result of her harassment complaints.  Having fully considered the parties' arguments and the legal issues raised, the Court concludes that Plaintiff has not established a claim for hostile-

environment sexual harassment or retaliation.   Consequently, Defendant's Motion for Summary Judgment is **GRANTED**.

## I.      FACTUAL BACKGROUND

Defendant is a cigarette manufacturer that operates a plant in Macon, Georgia, which employs over 1,500 workers.  Plaintiff began working at the Macon plant on January 3, 1977.  Plaintiff is a senior fabrication technician responsible for handling preventive maintenance on plant machinery.  In this capacity, Plaintiff works as part of a six-employee team.  Pl.'s Dep. I, at 17-18.

The offensive behavior which forms the basis of Plaintiff's lawsuit began in one of the plant's break rooms on September 29, 2002, when Plaintiff overheard a female co-worker comment to a male co-worker, "[O]h you got one of those girlie magazines."  Pl.'s Dep. I, at 29.  Plaintiff caught a glimpse of the magazine for an estimated one to two seconds, and saw that it said "MAXIM" on its cover.  Pl.'s Dep. I, at 28-29.  Later that afternoon, in the same break room, Plaintiff approached two male co-workers looking at what appeared to be the same magazine.  Before one of the co-workers closed the magazine out of embarrassment, Plaintiff saw a picture of a woman wearing a "red, white, and blue outfit" that was "[r]eally, really skimpy."  Pl.'s Dep. I, at 33-34.  At the time these events occurred, Plaintiff did not report either of them to B&W personnel.  Pl.'s Dep. I, at 42.

About a month later, on October 25, 2002, Plaintiff saw a co-worker looking at a magazine in the plant's main cafeteria and, as he flipped through the pages, viewed a woman wearing a bikini and an image of a woman's legs "kind of crossed up in the air."

Pl.'s Dep. I, at 38.  Plaintiff approached her co-worker and informed him that "stuff like this . . . does not belong in my workplace."  Pl.'s Dep. I, at 39.  Shocked, her co-worker said nothing.  Pl.'s Dep. I, at 39.  Plaintiff reported this incident to her supervisor, Mark Young, but did not inform him of the September 29 incidents and did not identify any names at that time.  Later that day, Plaintiff met with B&W's Senior Employee Relations Supervisor, Mike Stevens, and a representative of the local union, Marty Davis.  Plaintiff complained about having seen offensive magazines in the plant (in both September and October) but still did not to disclose the names of those involved.  Pl.'s Dep. I, at 43.

Following a sweep of the break rooms which did not reveal any sexually oriented magazines, Mr. Stevens, on November 5, advised Plaintiff that B&W would not effect an outright ban on what the company considered "grey area" magazines—presumably, those which do not contain full nudity and are not considered adult only.  Pl.'s Dep. I, at 44-45.

A couple of months later, on January 28, 2003, Plaintiff again saw two co-workers looking at a MAXIM magazine in the break room.  Pl.'s Dep. I, at 52-55.  As Plaintiff approached, the magazine was placed face down on the table.  Pl.'s Dep. I, at 54.  Plaintiff did not report this incident to B&W personnel at the time.  Pl.'s Dep. I, at 58.  On February 10, 2003, Plaintiff saw a co-worker looking at a magazine at a table in the break room and, as she made her way to a nearby vending machine, she briefly saw a picture of a woman wearing a black lace bikini.  Pl.'s Dep. I, at 59.  According to Plaintiff, her co-worker said "[s]omething about being a traitor," at which point Plaintiff left the room.  Pl.'s Dep. I, at 60-61.  Later the same day, Plaintiff saw two co-workers looking at an unidentifiable magazine.  One of them looked up from the magazine and grinned at Plaintiff.  Pl.'s Dep. I,

3

at 64.  Plaintiff could only see a liquor advertisement on the back of the magazine.  Pl.'s Dep. I, at 64.

Plaintiff provided notice of the January 28 and February 10 incidents to B&W through a letter from her attorney dated February 19, 2003.  Pl.'s Ex. 3.  The letter provided, for the first time, the names of those B&W employees involved in the September and October 2002 incidents.  Defendant subsequently interviewed these individuals and obtained their promise not to bring MAXIM magazines into the workplace in the future.  Additionally, Defendant conducted sweeps of the break rooms to determine whether any inappropriate magazines were in the plant.  B&W communicated these actions in a letter to Plaintiff's attorney dated March 10, 2003.

On March 15, 2003, Plaintiff overheard one of her co-workers (previously identified and interviewed by B&W), while leaning back in his chair and resting his hand on his crotch, say to a fellow co-worker that B&W did not need "a bunch of fucking children."  Pl.'s Dep. I, at 73.  This incident was related to B&W in a letter from Plaintiff's attorney dated March 21, 2003.  B&W interviewed those individuals who were either involved in or witnessed the episode.  B&W was not able to confirm that the offensive comment was directed at Plaintiff.  Pl.'s Dep. I, at 76.  And no one could corroborate Plaintiff's claim that her co-worker had placed his hand on his crotch while making the statement.  Pl.'s Dep. I, at 76-77.  The results of the investigation were reported to Plaintiff by Mr. Montreuil, B&W's Human Resource Manager at the Macon plant.  Pl.'s Dep. I, at 76.

On March 25, 2003, while exiting the plant with a group of ten to twelve employees around her, Plaintiff heard a male co-worker say he was "enjoying the view and he

wondered what it looked like." Pl.'s Dep. I, at 79.  Plaintiff never turned around to visually confirm the identity of the speaker.  Plaintiff nevertheless reported the situation to Mr. Montreuil, who subsequently interviewed those individuals Plaintiff suspected of being involved.  Mr. Montreuil was unable to confirm that the comment was in any way directed at Plaintiff.  Pl.'s Dep. I, at 83.

On March 29, 2003, the individual who Plaintiff believed made the March 25 comment came into Plaintiff's work area—an area in which he was not supposed to be since he was not a member of the preventive maintenance team.  Pl.'s Dep. I, at 84.  According to Plaintiff, he shifted his weight around and made physical contact with her.  Pl.'s Dep. I, at 84.  Plaintiff almost lost her balance.  Pl.'s Dep. I, at 84.  Following the contact, the co-worker in question glared at her several times before walking off.  Pl.'s Dep. I., at 89.  She reported this incident to B&W over a week later, and several days after her complaint Mr. Montreuil informed Plaintiff that he was unable to find any evidence to corroborate her version of events.  Pl.'s Dep. I, at 89-90.

On July 14, 2003, Plaintiff took a copy of FHM—a magazine comparable to MAXIM—from someone else's toolbox and took it to her attorney.  Pl.'s Dep. II, at 8-9.  Plaintiff reported the presence of the magazine, including the name of the individual listed on the address label, to Mr. Montreuil on August 15, 2003.  Mr. Montreuil spoke with the individual and asked him not to bring the magazines into the workplace again.  Pl.'s Dep. II, at 9.

Plaintiff approached some of her co-workers at various times and asked them to stop using profane language in her presence.  Montreuil Dep., at 96-97.  Sometime

thereafter, Plaintiff found that certain pieces of equipment inside the plant had been configured in a manner that forced her to walk a different-than-usual route to lock out and tag out her equipment at the beginning and end of each shift.  Initially she complained about this matter to her supervisor, Mr. Ken Califf, who, in turn, had a buggy removed to allow her to use her preferred route.  Plaintiff complained that her path was blocked again and Mr. Califf, on February 16, 2004, advised her that in his opinion she should walk around the machinery to place her lock out tag on at the beginning of her shift and remove it at the end of the shift.  Pl.'s Dep. I, at 119.

On February 27, 2004, Plaintiff discovered a poster belonging to her with the word "over" written on the front and the words "FUCK U" written on the back.  Pl.'s Dep. I, at 108-109.  The poster was positioned on a corkboard used by Plaintiff and other senior fabrication technicians and did not have any identifying characteristics to indicate that she was the owner.  Pl.'s Dep. I, at 110.  Plaintiff never discovered who was responsible for writing on her poster.  Pl.'s Dep. I, at 110.

On March 22, 2004, Plaintiff approached one of her co-workers and explained that she did not feel comfortable with his use of inappropriate language and asked him to stop using it around her.  Pl.'s Dep. I, at 112.  According to Plaintiff, this individual got in her face and told her that his language was not inappropriate and that he felt like he was being singled out.  Pl.'s Dep. I, at 112.  He also told her that she was not welcome on the Packing side of the plant because it is a "man's area" where "man talk" takes place.  Pl.'s Dep. I, at 112.  After making a number of complaints to her co-workers regarding their use of coarse language, Plaintiff was given instructions to bring all future complaints to Mr.

6

Montreuil so as to avoid disruption and upheaval among the workers.  Plaintiff was warned in a B&W memorandum that her failure to do so could potentially result in disciplinary action, up to and including termination.  *See* Pl.'s Ex. 22.

On March 28, 2004, Plaintiff saw a picture of the model/actress Anna Nicole Smith taped to the interior of a cabinet in the plant. Pl.'s Dep. II, at 21.  In June of 2004, Plaintiff discovered a magazine called "In the Wind" in one of the break rooms.  No one else was present in the break room.  The cover does not display any nudity but states that it is an "adults only" magazine.  *See* Pl.'s Ex. 11.  Plaintiff opened the magazine and flipped through the pages, which revealed pictures of nude women.  Plaintiff turned the magazine over to her attorney.

After filing a charge of discrimination with the Equal Employment Opportunity Commission, and receiving her notice of right to sue, Plaintiff initiated this Title VII suit. Plaintiff claims that these events have had a severe, negative effect on her life and work. She maintains that it has been difficult to return to work and, when she eventually did return, hard to fully concentrate on work-related tasks.   She now chooses to use inconvenient break rooms because she does not like to go into the areas where she witnessed co-workers reading the offensive magazines.  Plaintiff reports feeling ostracized by her co-workers as a result of making complaints about their language and behavior. Additionally, she claims that the hostility she feels at work has resulted in a lack of desire to sign up for overtime hours.  She reports increased difficulty sleeping and is undergoing counseling treatment.  Her doctor has prescribed medication to help combat her stress level.

## II.      SUMMARY JUDGMENT STANDARD

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also* **Celotex Corp. v. Catrett**, 477 U.S. 317, 322 (1986).  A genuine issue of material fact necessary to defeat a properly supported motion for summary judgment arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 248 (1986).  The Court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but may not make credibility determinations or weigh the evidence.  *See* **Anderson**, 477 U.S. at 249.  Finally, it should be remembered that "the evidence presented cannot consist of conclusory allegations or legal conclusions."  **Avirgan v. Hull**, 932 F.2d 1572, 1577 (11th Cir. 1991).

## III.     LEGAL DISCUSSION

### A.       Plaintiff's Hostile Work Environment Claim

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C.A. § 2000e-2(a)(1) (West 2003).  Though the words 'sexual harassment' are absent from the statute, the Supreme Court and the Eleventh Circuit have repeatedly emphasized that "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which

includes requiring people to work in a discriminatorily hostile or abusive environment." ***Harris v. Forklift Sys., Inc.***, 510 U.S. 17, 21 (1993) (citing ***Meritor Sav. Bank, FSB v. Vinson***, 477 U.S. 57 (1986)); *see also* ***Henson v. City of Dundee***, 682 F.2d 897, 901 (11th Cir. 1982).

To establish a sexual harassment claim under Title VII, an employee must allege and prove: "(1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable." ***Mendoza v. Borden, Inc.***, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc) (citing ***Henson***, 682 F.2d at 903-05).  There is no dispute that Plaintiff belongs to a protected group.  Defendant, likewise, does not challenge Plaintiff's evidence with respect to the second or third elements.  Instead, Defendant maintains that it is entitled to summary judgment because Plaintiff has failed to identify a genuine issue of material fact with respect to the fourth and fifth elements.

### 1.  Sufficiently Severe or Pervasive Harassment

Because hostile-environment harassment claims generally lack explicit, direct evidence of discrimination, "an employee must make some showing in order to connect allegations of sexual harassment to a violation of Title VII."  ***Mendoza***, 195 F.3d at 1245. This sort of sexual harassment does not qualify as unlawful discrimination under Title VII

unless it is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor*, 477 U.S. at 67. Thus, not all harassment is remediable under Title VII. *See Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) ("Title VII 'does not prohibit all verbal or physical harassment in the workplace.'").

Determining whether harassing conduct is sufficiently severe or pervasive to entitle a plaintiff to protection under Title VII involves both a subjective and an objective inquiry. *Harris*, 510 U.S. 21-22. First, the employee must subjectively perceive her working environment to be hostile or abusive. Second, the working environment must be one "that a reasonable person would find hostile or abusive." *Id.* at 21. Thus, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment . . . is beyond Title VII's purview." *Id.* In this case, there is little question that Plaintiff subjectively perceived her work environment to be hostile and abusive. Therefore, the Court's analysis will focus on whether Plaintiff has produced sufficient evidence to show that the behavior of her co-workers created a work environment that a reasonable person in her position would find hostile or abusive.

"[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (quoting *Harris*, 510 U.S. at 23). The Eleventh Circuit, following the Supreme Court's lead, has articulated four factors to guide lower courts in analyzing whether alleged harassment is objectively severe or pervasive enough to qualify as discrimination under Title VII: "(1) the frequency of the

10

conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." ***Mendoza***, 195 F.3d at 1246 (citing ***Allen v. Tyson Foods***, 121 F.3d 642, 647 (11th Cir. 1997)).

These factors are not intended to be exhaustive. Indeed, it is important to consider the context in which the alleged discrimination occurred. Courts must consider the totality of the circumstances, and must not treat these factors as discrete elements. ***Id.***; *see also* ***Hulsey v. Pride Rest., LLC***, 367 F.3d 1238, 1248 (11th Cir. 2004) ("[W]e employ a totality of the circumstances approach, instead of requiring proof of each factor individually."). The Court will now apply these factors to the incidents which Plaintiff relies on in pursuing her hostile-environment claim. Doing so will allow the Court to determine whether the totality of the circumstances shows that a triable issue of fact exists regarding the pervasiveness or severity of the alleged harassment.

a.    *Frequency*

Viewing the evidence in the light most favorable to Plaintiff, the Court is able to identify approximately seventeen incidents—occurring over a span of nineteen months—which, when taken together, Plaintiff argues created an objectively hostile working environment. These incidents have been sufficiently described above in the statement of facts. They will not be repeated here.

Though quantifying individual acts of allegedly discriminatory conduct has its purposes, the Court is mindful that Title VII is not triggered by a "magic number" of harassing incidents. *See* ***Miller v. Kenworth of Dothan, Inc.***, 277 F.3d 1269, 1276 (11th

11

Cir. 2002) (citing **Shanoff v. Ill. Dep't of Human Servs.**, 258 F.3d 696, 704 (7th Cir. 2001)).  Sexual harassment allegations cannot, and should not, be reduced to a game of number counting; however, generally speaking, "offhand comments [ ] and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" **Faragher v. City of Boca Raton**, 524 U.S. 775, 788 (1998).  Accordingly, the frequency factor must be analyzed on a case-by-case basis.

A review of the case law in this Circuit demonstrates that the objectionable conduct relied upon by Plaintiff to support her hostile-environment claim—primarily the viewing of offensive magazines and the use of coarse language by her co-workers—occurred with far less regularity than did the conduct in those cases where summary judgment was found to be inappropriate.  For instance, the Eleventh Circuit has found that "roughly fifteen separate instances of harassment over the course of four months" tended to point in the direction of objectively severe and pervasive harassment.  **Johnson**, 234 F.3d at 509.  Importantly, the court in **Johnson** suggested that harassment is not as likely to be severe and pervasive when the evidence consists of "less objectionable conduct [taking place] over longer periods of time."  **Id.**  A plaintiff's claim under Title VII is significantly stronger when she can point to evidence of a "'continuous barrage of sexual harassment.'"  **Id.** (quoting **Dees v. Johnson Controls World Servs., Inc.**, 168 F.3d 417, 418 (11th Cir. 1999)).  **See, e.g., Hulsey**, 367 F.3d at 1248 (reversing grant of summary judgment in defendant's favor where conduct occurred 18 times during a 2 to 2-1/2 week period).

The conduct Plaintiff complains about was episodic; often separated by a period of weeks and sometimes months.  In between these isolated incidents, Plaintiff does not

appear to have encountered any problems with her day-to-day working conditions. The incidents, if equally distributed across the entire nineteen-month period, would come to less than one per month. Frequent is an apt characterization of these events. The conduct complained of falls short of creating a "continuous barrage" of harassment. Nevertheless, the Court is aware that dispositive weight is not to be accorded to a single factor. It is the totality of the circumstances that is ultimately determinative.

### b.   Severity

Well over half of the incidents cited by Plaintiff focus on her discomfort with seeing sexually suggestive magazines or pictures at work. The Court will briefly summarize each of these circumstances, while emphasizing the context in which each occurred.

On four occasions, Plaintiff witnessed her co-workers looking at MAXIM magazines (or similar, but unidentifiable, magazines). Plaintiff admits that on these occasions her co-workers minded their own business, never making sexual comments or sexually oriented gestures of any sort. *See* Pl.'s Dep. I, at 29, 34, 38, 55-56. On a fifth occasion, a co-worker, while looking at a magazine Plaintiff found offensive, said as Plaintiff walked by "something about being a traitor."[1] Pl.'s Dep. I, at 60. Plaintiff did not respond and her co-worker said nothing further. Later that day, two co-workers were looking at a magazine Plaintiff could not identify, and one of them looked at Plaintiff and grinned. *See* Pl.'s Dep.

---

[1] By the time this comment was made, Plaintiff had already complained to her supervisor and to the human resources department that she was not comfortable having to see sexually suggestive magazines at work. *See* Pl.'s Dep. I, at 43. Shortly thereafter, a representative from human resources informed Plaintiff that magazines like MAXIM were "grey area" magazines and that, unless someone, while looking at the magazine, made some sort of "sound or motion or some kind of sexual intention," the magazines would not be prohibited. *See* Pl.'s Dep. I, at 44.

I, at 64.  His grin was unaccompanied by any sound, statement, or gesture.

Plaintiff's seventh magazine-related complaint involved her finding an edition of FHM—a magazine substantially similar to MAXIM—lying on a toolbox inside the plant.  *See* Pl.'s Dep. II, at 8.  It does not appear from Plaintiff's deposition testimony that anyone else was present at the time she picked it up.  *See* Pl.'s Dep. II, at 8.  On three occasions, during August and September of 2003, Plaintiff testified that she found magazines in various places throughout the plant containing pictures of scantily clad women.  *See* Pl.'s Dep. II, at 11-14.

On an eleventh occasion, Plaintiff found a picture of the actress/model Anna Nicole Smith taped inside a cabinet in an isolated, out-of-the-way area of the plant.  *See* Pl.'s Dep. II, at 21.  In the picture, Ms. Smith's breasts feature prominently, but she is fully clothed.  *See* Def.'s Ex. 17.  Nevertheless, Plaintiff found the picture offensive.  *See* Pl.'s Dep. II, at 23.  Plaintiff's twelfth, and final, complaint regarding offensive magazines concerns a magazine called "In the Wind," which Plaintiff found lying on a table in one of the employee break rooms.  *See* Pl.'s Dep. II, at 40-41.  No one was present when Plaintiff found the magazine.  *See id.*  Plaintiff decided to pick up the magazine and look through it, finding, in her words: "A lot of naked women.  A lot of partying."  Pl.'s Dep. II, at 45; Pl.'s Ex. 11.

On the occasions when Plaintiff witnessed male co-workers looking at offensive magazines in the break room, not one of them ever made a sexual remark to Plaintiff.  None ever made a sexual gesture toward her.  None ever touched, felt, or rubbed against her.  None ever forced her to look at the magazines.  None ever asked her to look at the

14

magazines or held them up for her to see.  In short, nothing indicates that Plaintiff's co-workers wanted her to see the magazines at all; in fact, Plaintiff's deposition testimony suggests that on at least one occasion a fellow co-worker shut the magazine he was looking at when she approached.  On another occasion, a co-worker took his magazine and moved to another table further away from Plaintiff.  *See* Pl.'s Dep. I, at 33-34, 54. With respect, then, to the presence of offensive magazines in the B&W plant, the Court has little trouble concluding that Plaintiff's evidence presents no hint of objective severity. While Plaintiff may find these magazines distasteful and personally objectionable, their presence, coupled with the fact that no co-worker exhibited harassing behavior while looking at them, would not amount to severe harassment in the eyes of a reasonable employee in Plaintiff's position.

In addition to Plaintiff's objections regarding the magazines and photographs, she argues that certain comments and behavior contributed to the hostility of the workplace. Plaintiff notes that once, while in her presence, a fellow co-worker had his hand on his crotch and commented that B&W does not need "a bunch of  fucking children."  Pl.'s Dep. I, at 73.  However, Plaintiff's own testimony makes clear that the comment was not directed at her.  *See* Pl.'s Dep. I, at 74.   Rather, the comment was made to another co-worker during a discussion about their dissatisfaction with certain B&W employees whose behavior made it difficult for them to take work breaks.  Pl.'s Dep. I, at 74.  When asked if the comment was directed at her, Plaintiff stated that "I heard it loud and clear."  Pl.'s Dep. I, at 74.  She found the language inappropriate, remarking in her deposition that such talk "doesn't need to be presented in front of a lady" and that "I should be respected

enough for that comment not to be made while I was sitting there."  Pl.'s Dep. I, at 74.

After Plaintiff expressed her concerns over the magazines to B&W officials, one of her co-workers (a friend of one of the targets of Plaintiff's magazine complaints) began taking his breaks in the same break room as Plaintiff and began "glaring" at her "[l]ike he hated me."  Pl.'s Dep. I, at 79.  One day, while walking out of the plant behind Plaintiff, this co-worker said "he was enjoying the view and he wondered what it looked like."  Pl.'s Dep. I, at 79.  Eye contact was not made with Plaintiff, and she did not turn around when the comment was spoken.  Pl.'s Dep. I, at 79.  Plaintiff believed the comment was "indirectly toward me" because of the earlier occasions on which this co-worker glared at Plaintiff.  Pl.'s Dep. I, at 79.

On March 29, 2003, this same co-worker approached Plaintiff at her work station and, according to Plaintiff, "all of a sudden shift[ed] his weight into me, throwing himself into me."  Pl.'s Dep. I, at 84.   After this contact was made, no words were exchanged between the two, but Plaintiff's co-worker "snickered or something, you know, like it was funny."  Pl.'s Dep. I, at 87.

On February 27, 2004, Plaintiff discovered that a poster of hers which she kept at the plant had been defaced.  The poster had the word "over" written on one side and the words "FUCK U" on the other.  Pl.'s Dep. I, at 109.  The poster was attached to a corkboard over the work bench where Plaintiff frequently worked, though this work space is not solely hers; it is also utilized by workers on other shifts.  Pl.'s Dep. I, at 110.

Finally, Plaintiff complains that her co-workers positioned certain pieces of work equipment around the inside of the plant, effectively creating a barricade which made it

more difficult for her to access areas necessary to her work.  Pl.'s Dep. I, at 117-119.

Even assuming that these isolated incidents can be considered harassment based on Plaintiff's sex—a contention not argued by the parties and one which the Court does not address[2]—they do not, when taken together, rise to the level of severity needed to support a finding of objective hostility or abusiveness.  It cannot be said that a reasonable employee in Plaintiff's position would view these few instances as severe or pervasive.  Plaintiff views this behavior as unpleasant, unjustified, mean-spirited, and offensive.  However, Title VII does not provide a remedy for subjectively objectionable behavior in the workplace.

### c.    Physically Threatening or Humiliating

As should be clear from the discussion above, the incidents Plaintiff cites in support of her hostile-environment claim cannot reasonably be construed as physically threatening or humiliating.  Instead, the comments made by her co-workers and the profane language which she finds indecent amount to no more than "mere offensive utterance[s]."  *Mendoza*, 195 F.3d at 1246.

### d.    Unreasonable Interference with Performance

Plaintiff argues that these episodes have severely hampered her ability to concentrate on her job and to perform her work effectively.  In addition, she maintains that she must now use different break rooms to avoid certain co-workers; she no longer finds it possible to work overtime; she has suffered emotional problems, for which she is

---

[2] Because the totality of the circumstances shows that the conduct Plaintiff complains of was not severe or pervasive enough to alter the terms and conditions of her employment, the Court assumes, without deciding, that this conduct is of a sexual nature.  *See Mendoza*, 195 F.3d at 1298.

currently being medicated and receiving professional therapy.

Any interference suffered by Plaintiff appears to the Court to be of her own making. Though some might find magazines like MAXIM and FHM in poor taste and degrading to women, an occasional passing glimpse of one of these magazines is simply insufficient to transform an otherwise peaceful and productive workplace into an objectively hostile or abusive one.  The evidence does not suggest that a reasonable employee in Plaintiff's position would have suffered the sort of anguish and inability to work that she claims have beset her.

After construing Plaintiff's evidence in the light most favorable to her, and giving due consideration to the **Mendoza** factors, the Court concludes that, as a matter of law, the conduct highlighted by Plaintiff is not sufficiently pervasive or severe to alter the terms and conditions of her employment.  Thus the conduct fails to qualify as discrimination under Title VII.  Because Plaintiff is unable to establish each element of her hostile-environment claim, Defendant is entitled to summary judgment.[3]

### B.    Plaintiff's Retaliation Claim

Plaintiff alleges a retaliation claim against B&W for failing to prevent its employees from treating Plaintiff with a lack of civility and courtesy after she confronted them about their use of vulgar language and their penchant for looking at sexually suggestive magazines.  A prima facie case of retaliation under Title VII consists of three elements: "'the plaintiff must show (1) that she engaged in statutorily protected expression; (2) she

---

[3] Having found that the conduct cited by Plaintiff is not sufficiently severe or pervasive to support a hostile-environment claim under Title VII, the Court does not address the parties' contentions regarding the fifth element—a basis for imposing employer liability.

suffered an adverse employment action; and (3) that there is some causal relation between the two events.'" ***Cooper v. Southern Co.***, 390 F.3d 695, 740 (11th Cir. 2004) (quoting ***Meeks v. Computer Assocs. Int'l***, 15 F.3d 1013, 1021 (11th Cir. 1994)).  Because Title VII prohibits an employer from discriminating against an employee who opposes what she reasonably and in good faith believes to be unlawful discrimination, "[t]he employee need not prove the underlying claim of discrimination which led her to protest."  ***Tipton v. Canadian Imperial Bank of Commerce***, 872 F.2d 1491, 1494 (11th Cir. 1989).[4]

Defendant contends that Plaintiff's retaliation claim must fail because she cannot show that she suffered an adverse employment action.  Two types of actions are recognized as adverse employment actions for Title VII retaliation purposes: (1) ultimate employment decisions; and (2) non-ultimate employment decisions that otherwise "'meet some threshold level of substantiality.'" ***Stavropoulos v. Firestone***, 361 F.3d 610, 616-17 (11th Cir. 2004) (quoting ***Bass v. Bd. of County Comm'rs***, 256 F.3d 1095, 1118 (11th Cir. 2001)).  "Ultimate employment decisions include decisions such as termination, failure to hire, or demotion."  ***Id.*** at 617 (citing ***Wideman v. Wal-Mart Stores, Inc.***, 141 F.3d 1453, 1456 (11th Cir. 1998)).  Plaintiff was not fired, demoted, or denied a position.  Neither did she suffer a reduction in pay, position, or benefits.  Plaintiff therefore concedes that, in order to make out her prima facie case of retaliation, she must be able to show that Defendant took some other action meeting a threshold level of substantiality.

The requisite level of substantiality cannot be measured by applying a bright-line

---

[4] Retaliation claims are governed by the familiar burden-shifting framework set forth in ***McDonell Douglas Corp. v. Green***, 411 U.S. 792 (1973).

test. It must be determined on a case-by-case basis. *See Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000). The standard for assessing whether an action is sufficiently substantial involves both a subjective and an objective component. *See id.*; *see also Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1448-89 (11th Cir. 1998) (refusing to rely solely on an employee's subjective preferences and expectations in assessing adverse employment actions). Subjective beliefs, standing alone, are not a reliable indicator of adverse employment actions, as Title VII plaintiffs nearly always feel that their employment has been adversely affected. Ultimately, then, the threshold of substantiality requires that the employment decision be "'objectively serious and tangible enough' to alter [the employee's] 'compensation, terms, conditions, or privileges of employment.'" *Gupta*, 212 F.3d at 588. In making substantiality determinations, courts must remember that "Title VII is neither a 'general civility code' nor a statute making actionable the 'ordinary tribulations of the workplace.'" *Id.* at 587.

Plaintiff contends that B&W subjected her to an adverse employment action when it failed to discipline any of its employees for the following incidents, which she contends substantially altered her "compensation, terms, conditions, or privileges of employment" and "adversely affect[ed] [her] status as an employee." *Id.* (citing *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)). (1) The statement by Plaintiff's co-worker that B&W did not need a "bunch of fucking children." Pl.'s Dep. I, at 73; (2) The statement by Plaintiff's co-worker that "he was enjoying the view and he wondered what it looked like." Pl.'s Dep. I, at 79; (3) The incident in which Plaintiff's co-worker physically threw himself into her. Pl.'s Dep. I, at 84; (4) The blocking of Plaintiff's access to her work

areas; the ostracization of Plaintiff by other employees; and the fact that her property had been defaced. Pl.'s Dep. I, at 111 & Ex. 13.

These allegedly retaliatory actions were taken by Plaintiff's co-workers, not by Defendant. Plaintiff concedes as much. However, Plaintiff argues that Defendant's failure to discipline these employees constitutes an adverse employment action. The Eleventh Circuit has yet to address the precise issue of when an employer may be held liable, if at all, for a Title VII retaliation claim premised on co-worker harassment. However, the Court finds that the position taken by the Tenth Circuit is instructive.

In *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1264 (10th Cir. 1998), the court held that "co-worker hostility or retaliatory harassment, *if sufficiently severe*, may constitute 'adverse employment action' for purposes of a retaliation claim." (emphasis added). Yet, in determining the circumstances under which such hostility can be attributed to the employer, the court noted that liability under Title VII should not be imposed unless the employer's "supervisory or management-level personnel orchestrated, condoned, or encouraged the co-workers' actions." *Id.* at 1265. *See Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1039 (7th Cir. 1998) ("[A]n adverse employment action might occur when an employer orders it employees to shun the plaintiff, provided that this activity causes material harm to the plaintiff.").

Here, Plaintiff has not demonstrated that any of Defendant's supervisory or management-level personnel "orchestrated, condoned, or encouraged" the behavior which forms the basis of her retaliation claim. The Court can find no reason to adopt any lesser standard of employer liability in this instance. Thus, Plaintiff cannot establish that she

21

suffered an adverse employment action—the second element of the prima facie case.  Her

retaliation claim must fail as a matter of law.[5]

## III.   CONCLUSION

There is little doubt that Plaintiff was treated in a boorish manner by several of her

fellow employees.  As the Eleventh Circuit has made clear, however, boorish behavior

does not always equate with sexual harassment, and it is obvious that it did not on this set

of facts.  *See Gupta*, 212 F.3d at 583.

Because the conduct Plaintiff complains of is not sufficiently severe or pervasive to

alter the terms of her employment, the Court concludes that Plaintiff has failed to establish

the elements of a hostile-environment sexual harassment claim under Title VII.  And

because Plaintiff's employer has not subjected her to an adverse employment action,

Plaintiff is unable to establish the prima facie elements of her retaliation claim.

Accordingly, Defendant's Motion for Summary Judgment is hereby **GRANTED.**


SO ORDERED, this 24th day of May, 2005.


**/s/ Duross Fitzpatrick**
DUROSS FITZPATRICK, JUDGE
UNITED STATES DISTRICT COURT

DF/sew

---

[5] Even were the Court to determine that B&W could be held responsible for the behavior of Plaintiff's co-workers, such behavior still would not amount to an 'adverse employment action' for Title VII purposes because it does not, under the totality of the circumstances, meet a threshold level of substantiality.  *See Stavropoulos*, 361 F.3d at 616-17.